**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-375 (TSC)** |
| **v.** | : | |
| | : | |
| **ANTHONY RICHARD MOAT,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Defendant Anthony Richard Moat to 21 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

I.     **Introduction**

Defendant Anthony Richard Moat (hereinafter, "Moat") participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 20, 2022, (ECF No. 40 at ¶ 6) reflects a sum of more than $2.7 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Moat pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of 21 days' incarceration is appropriate in this case because Moat (1) witnessed a chaotic scene on Capitol Grounds, including tear gas, barricades, and rioters using force used against police officers, and nevertheless continued towards the Capitol; (2) yelled out to the crowd and recorded or broadcast events on his phone; (3) entered the Capitol through the Senate Wing Door despite hearing fire alarms, chanting from the crowd, and loud banging; (4) instructed a friend on how to enter the Capitol; (5) deleted his social media to thwart investigators; and (6) has not shown remorse for his actions that day, only remorse that he is being held accountable.

The Court must also consider that Moat's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, Moat's willing participation in a riot that succeeded in halting the Congressional certification, his encouraging a friend to enter the Capitol, and his lack of remorse make a sentence of incarceration both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 40 (Statement of Offense), at ¶¶ 1-7.

### Defendant Moat's Role in the January 6, 2021 Attack on the Capitol

After the November 3, 2020 election, Moat and a friend, C.M., wrote text messages back and forth regarding the Certification of the Electoral College vote. For example, on December 13,

2020, Moat wrote to C.M., "The electors vote tomorrow" and "They aren't officially counted util [*sic*] January 6th, so in theory there is still some wiggle room.  But we need to start winning legal cases or it's over."  Later that day, Moat wrote, in part, to C.M.:

> [I]f it can be proven in a court . . . is that if they found fraud enough to prove a different outcome they would have to undo the election.  Up to and until January 20th … is there a military option?  Idk like I said, this is all uncharted territory.

> On January 3, 2021, Moat wrote a text message to a friend, "Jan 6th is the day."

Shortly thereafter, Moat wrote to C.M., "If this isn't resolved, I think red states should secede" and "I'm not even kidding."  During the same conversation, C.M. asked Moat about the status of the election and Moat responded, "All comes down to Pence" and "I'll be there Wednesday."  Moat then explained the 12th Amendment to C.M., sending her a copy of the amendment, and he wrote, "The VP has all the power to reject or accept whatever slate of electors he wants" and "January 6th is the day."  Shortly thereafter, Moat wrote to C.M. that "the counting of electors starts at 1pm in [*sic*] January 6."

On or before January 6, 2021, Moat traveled to Washington, D.C., from his home in Philadelphia, Pennsylvania, to attend the "Stop the Steal" rally in Washington, D.C.

On January 6, 2021, after listening to President Trump's speech, Moat was part of the mob that advanced past the Capitol's restricted perimeter towards the western side of building.  At approximately 12:53 p.m., the first breach of the outer perimeter of Capitol Grounds occurred at the Peace Circle Monument.



*Image of the perimeter breach at the Peace Circle Monument at approximately 12:53 p.m.*

In Moat's statement to probation, he stated after the then President spoke, he walked towards the Capitol Building and stopped for lunch at a food truck. ECF 42 at ¶ 19.  Moat stated after lunch he stood "just beyond the Peace Monument."  At 12:59 p.m., Moat sent a text message to T.M.  Moat wrote, "We stormed the capitol."  Based on this text and his statement to probation, it is likely Moat was present at or near the time of the first breach of the Capitol's restricted perimeter.

While on the western side of the restricted grounds, Moat observed barriers that were put in place by United States Capitol Police, tear gas being used on the mob, and members of the mob using force against officers.



*Moat (boxed in yellow) on western side of Capitol by line of police officers[2]*

While on the Lower West Terrace, Moat walked back and forth near the police line, used his cellphone to view or broadcast what he was seeing, and he also yelled out to the crowd, appearing to encourage them.



*Moat (circled in red) in Exhibit 4 at 1:17*

Moat continued with the mob towards the Senate Wing Door on the western side of the Capitol.

---

[2] The police line at this location was not breached until approximately 1:48 p.m. Moat's presence at this location before the breach indicates he was one of the first rioters onto Capitol Grounds.



*Moat (circled in yellow) on Northwest Courtyard near Senate Wing Door*

At 3:09 p.m., Moat instructed a friend on the best way to get into the Capitol.



As Moat approached the breached Senate Wing Door, he pulled his cellphone out and began recording.



*Image from a video Moat took as he entered the Capitol (Exhibit 1)*

At 3:21 p.m., Moat entered the Capitol through the Senate Wing Door. As he entered, he heard loud banging from other rioters, the fire alarm ringing loudly in the background, and the mob chanting, "USA, USA."



*Side-by-side of CCTV showing Moat (circled in red) entering the Senate Wing Door*

Moat continued South, through the Capitol as he recorded the scene on his cellphone.

 

*Two images from Moat's cellphone video (Exhibit 2)*

As Moat recorded video and paraded down the hallway, he panned his camera into a Senate office that had been overrun by the mob.



*Image from video taken by Moat of Senate office (Exhibit 2)*

Moat then turned around and walked back down the hallway towards the Senate Wing Door.[3]  At 3:23 p.m., Moat left the Capitol through the Senate Wing Door.

Moat sent several text messages regarding his conduct and consciousness of guilt after he left the Capitol.  For example, on January 6, 2021, at 3:13 p.m., Moat wrote to a friend, C.M., "We stormed the capitol." Between 3:47 and 4:01 p.m., Moat and his friend, T.H., exchanged text messages.  T.H. wrote, "I know u have been waiting for something like this your whole life."  Moat responded, "[I do not know] what happens next . . . Roll over? War? Secession? Nothing?"  At 5:13 p.m., Moat sent a series of pictures from inside the Capitol to C.M. and he stated, "Don't tell anyone I was there" and "That's inside capitol."  At 5:14 p.m., Moat sent a different person three images from the restricted grounds of the Capitol[4] and one image from inside of the Capitol.

On January 12, 2021, Moat wrote to a friend, "I deleted my Facebook and took down LinkedIn too."  Moat continued, "They'd have to match my face somehow."

---

[3] In his interview with agents, Moat admitted seeing security cameras at this time, suggesting that Moat left because he was fearful that he would be identified.

[4] The two videos taken by Moat inside the Capitol (Exhibits 1 and 2) were first provided to agents by tipsters and subsequently by Moat after he was interviewed.  Moat did not provide these three images or items from his social media accounts to agents.  These messages and images were obtained pursuant to a search warrant after Moat surrendered his phone and password to agents.



*Defendant's Interview*

On February 19, 2021, Moat called the agent investigating this case. Moat told the agent that a friend of Moat's contacted him and said the agent was inquiring about Moat being present in the Capitol on January 6, 2021. Moat agreed to speak with the agent and admitted being inside the Capitol on January 6, 2021. Moat stated he was aware that the FBI was looking for people that went inside the Capitol during the riots. Moat stated he went to Washington, D.C. with his girlfriend and stayed at a hotel for two nights.

According to Moat, on January 6, 2021, he and his girlfriend attended the Trump speech, but could not get close and watched from the street. After the speech, Moat and his girlfriend stopped for lunch at a food-truck and then walked down to the Capitol. Moat described it as a chaotic scene, and he heard whispers about someone possibly being shot inside the Capitol. Moat

stated he was unsure what side of the Capitol he was on, but there was a stairway and scaffolding. Moat said he walked past police officers and thanked them for their service.

At 3 p.m., a large group of people began walking inside the Capitol. Moat stated he wanted to go inside, but his girlfriend did not and was too scared, so she left and went back to the hotel with their dog. Moat then followed a large group inside the Capitol and just walked in. Moat stated there were no officers stopping them or any barricades. This is inconsistent with pictures of Moat next to barricades and police holding a line and the Statement of Offence he agreed to and signed. ECF 40 at ¶ 8. Moat took video with his cell phone as he walked in and as he walked down a hallway. Moat stated he saw security cameras once he got inside. Moat stated he was only inside the Capitol for a minute or so, he did not cause any damage, and he did not assault any officers. Moat stated his intention was to show there were people on the ground that were looking into the election and show his support. He stated he did not go down to change any outcomes.

Moat stated he took down all his social media accounts.[5] He stated he had an anonymous Twitter account, but he did not want to provide that to agents. Moat then provided the agent the two videos he took inside the Capitol.[6]

*The Charges and Plea Agreement*

On April 7, 2021, the United States charged Moat by criminal complaint with violating 18 U.S.C. §§ 1752(a) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On April 9, 2021, law enforcement

---

[5] In the interview, Moat did not clarify if he took the accounts down before or after January 6, 2021. His cellphone was searched pursuant to a search warrant and photos, videos, and messages were obtained. On January 12, 2021, Moat wrote a message to T.M., "I deleted my Facebook and took down LinkedIn too" and "They'd have to match my face somehow." Based on his statement to agents and his text messages, Moat deleted his social media to conceal evidence of his crime.

[6] Moat's attorney provided his cellphone and password to agents. Agents obtained a search warrant and searched Moat's cellphone.

officers arrested Moat in Philadelphia, Pennsylvania.  On May 25, 2021, the United States charged Moat by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 28, 2022, pursuant to a plea agreement, Moat pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).

### III.     Statutory Penalties

Moat now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000.  He must also pay $500 restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days' incarceration and 36 months of probation.

### A.  The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Moat's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Moat, the absence of violent or destructive acts is not a mitigating factor. Had Moat engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors for Moat is his determination to continue into the Capitol despite witnessing the chaos around him.  Moat entered the restricted grounds early in the day, shortly after the initial breach at the Peace Circle Monument.  Moat then continued into the Capitol despite seeing tear gas deployed against the crowd, barriers erected to keep people out, hearing loud banging from other rioters inside, hearing alarms going off as he entered, and witnessing rioters using force against police.  Even after hearing someone had been shot inside, he continued. Though Moat's girlfriend was too scared to continue on, Moat was not deterred.  Moat attempted to minimize his conduct to agents, to probation, and to the Court at his plea colloquy, but he cannot deny what he witnessed before choosing to enter the Capitol.

Moat told probation that he left after he saw rioters rummaging through a Senate office. However, his statements and actions after January 6 tell a different story.  In his interview with the case agent, Moat stated that he observed security cameras once he got inside and turned around to head back outside.  Moat did not mention leaving because he saw rioters rummaging through

13

offices.  Then, days after January 6, 2021, Moat deleted his Facebook and LinkedIn, and told his friend, "They'd have to match my face somehow," showing Moat's reason for leaving was his awareness that security camera footage demonstrated his guilt.  It is also unlikely that Moat turned around because he saw rioters rummaging given that he was undeterred by barricades, tear gas, rioters being forceful with police officers, and hearing someone had been shot.  Seeing rioters moving papers did not change his heart.  Seeing security cameras and the ramifications that would flow from his image being recorded did.

Moat's deletion of his Facebook and LinkedIn accounts to avoid responsibility for his crimes is aggravating.  Moat knew from seeing the security cameras inside the Capitol that his face was captured, and that facial recognition technology was being used to identify those who went into the Capitol.  Moat then attempted to hide from his actions by deleting his social media to thwart law enforcement.  He continued to hide his actions until his friends were being contacted by agents and he could no longer avoid responsibility.  Only after he realized the FBI had identified him did he talk voluntarily with the agent in this case, though even then he minimized his conduct. While he does get credit for cooperation and his plea, his actions in deleting his social media are aggravating and warrant a sentence of incarceration.

To date, Moat has expressed no remorse for his criminal conduct, only regret that he was arrested for it.  In his statement to probation, Moat "strongly condemn[ed] and disavow[ed] all those who committed acts of violence, destroyed property, used intimidation, and disrespected police officers."  Moat is quick to condemn others but slow to take responsibility for his actions. He stated, "I deeply regret my stepping foot inside the Capitol that day and am frankly embarrassed at how long it took me to realize what was happening."  Moat again minimizes his culpability instead of taking responsibility.  The Court saw his minimizing at Moat's plea.  At his plea, the

Court and the government had to go over multiple additional details that show he knew he was not permitted inside.  Moat was unwilling to admit he knew he was not permitted in the building until it was elicited that he heard the fire alarms going off and saw the chaos outside the Capitol.  This behavior shows that Moat is not remorseful for his actions that day.  He does not comprehend that his presence empowered the mob by increasing its numbers.  He does not have remorse for enabling those who were violent or who destroyed property.  His lack of remorse warrants a sentence of incarceration.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Moat.

As set forth in the PSR, Moat has no criminal history. ECF 42 at ¶ 24.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.   "Future would-be rioters must be deterred."  (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence.  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Moat participated in the riot on January 6, despite watching rioters being forceful with police, hearing someone was shot, and seeing the barricades and tear gas around him.  He then told a friend what path to take to get into the Capitol.  Moat also celebrated his participation in the riot, writing, "We stormed the capitol."  After it was over, instead of expressing remorse, Moat deleted evidence of his crime in an effort to thwart law enforcement.  A sentence of incarceration is warranted to underscore that his conduct was criminal, and to deter him from engaging in lawless conduct in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This Court must sentence Moat based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Moat has pleaded guilty to Count 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

---

[7] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been

accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Miller et al*, 21-cr-266 (TSC), the defendants, Brandon and Stephanie Miller, pled guilty to misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G).  The Millers entered the Capitol through the Senate Wing Door via a window at 2:56 p.m. and they did not show remorse after January 6, 2021.  Gov. Sentencing Memo., *United States v. Brandon Miller*, 21-cr-266 (TSC), ECF 49 at 1-2; *United States v. Stephanie D. Miller,* 21-cr-266 (TSC), ECF 50 at 1-2.  Additionally, Brandon Miller broadcast his time in the Capitol over Facebook live.  *Brandon Miller*, 21-cr-266 (TSC), ECF 49 at 2.  This Court sentenced Brandon Miller to 20 days' incarceration and sentenced Stephanie Miller to 14 days' incarceration.  *Miller et al,* 21-cr-266 (TSC), ECF 52.

Moat entered the Capitol through the Senate Wing Door shortly after the Millers. Like the Millers, Moat took videos inside the Capitol, and like Brandon Miller, Moat sent pictures and videos of his time in the Capitol to his friends.  Although Moat spent less time in the Capitol, he

instructed his friend on how to get inside the Capitol, encouraged the crowd by yelling, appears to have recorded or broadcast video on social media, and admitted to deleting his Facebook and LinkedIn accounts to avoid responsibility.  Like the Millers, Moat did not show remorse after January 6.  Given the similarities to the Millers' case and the additional aggravating factors in Moat's case, Moat should be sentenced to 21 days' incarceration.

In *United States v. Donna Bissey*, 21-cr-165 (TSC), the defendant pled guilty to misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G).  Bissey entered the Capitol through the eastern front, walked through a single hallway, exited a little over ten minutes later, and she took a photograph inside which she later posted to Facebook.  Gov. Sentencing Memo., *Bissey*, 21-cr-165 (TSC), ECF 26 at 2.  This Court sentenced Bissey to 14 days' incarceration.  *Bissey*, 21-cr-165 (TSC), ECF 29.

Like Bissey, Moat entered the Capitol, paraded down one hallway, and left shortly thereafter.  Bissey shared a picture with friends on Facebook and Moat shared pictures with friends through multiple text messages.  Moat also appears to have recorded or broadcasted video on social media.  However, Moat's case is more aggravated because instead of accepting responsibility right away, like Bissey, he deleted his social media to thwart investigators.  Moat and Bissey were arrested the same month, but unlike Bissey, who pleaded guilty in July 2021, Moat pleaded guilty over a year later, in October 2022.  Like Bissey, Moat is given consideration for pleading and cooperating with the agents; however, his conduct, deletion of his social media, encouraging the crowd and a friend, and his lack of remorse warrant a sentence of incarceration.  Give the additional aggravating factors, Moat should be sentenced to 21 days' incarceration.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these

factors, the government recommends that this Court sentence Moat to 21 days' in prison and 36

months' probation. [8]  Such a sentence protects the community, promotes respect for the law, and

deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while

---

[8]      Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. *See, e.g.,* 18 U.S.C. § 3561(a)(3); *see, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law.

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992). In this district, at least two judges have similarly imposed multiple terms of imprisonment consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Brian Brady*
 Brian Brady
 Trial Attorney, Department of Justice
 DC Bar No. 1674360
 1301 New York Ave. N.W., Suite 800
 Washington, DC 20005
 (202) 834-1916
 Brian.Brady@usdoj.gov